## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE
## CIVIL ACTION NO. 3:03CV-P754-H

**FREDERICK JESSE HARRIS**                                              **PETITIONER**

**v.**

**GLEN HAEBERLIN** *et al.*                                              **DEFENDANTS**

### MEMORANDUM OPINION

### I.  Introduction

This case is before the Court on remand from the Sixth Circuit Court of Appeals.
Specifically, the Sixth Circuit directed this Court to conduct a renewed *Batson* hearing to
reassess prosecutorial credibility in light of a videotaped conference between members of the
prosecution team during the selection of Harris's jury in 1998.  Prior to the remand, no trial court
had evaluated the actual conference.  In accordance with the Sixth Circuit's instructions, this
Court conducted a renewed *Batson* hearing.  After doing so, for the reasons set forth below, the
Court finds that no *Batson* violation occurred during the selection of Harris's jury.

### II.  Facts Underlying the Crimes at Issue

The facts underlying Harris's conviction are fully recounted in the Supreme Court of
Kentucky's unpublished decision on direct appeal.  *Harris v. Commonwealth*, 1998-SC-0414-
MR (Ky. Mar. 16, 2000) (DN 15, App. at A-161 to A-177).  The Supreme Court of Kentucky
summarized the facts as follows:

> Barbara Morris testified that on Sunday, July 20, 1997, she was in the parking lot of
> the Kroger's store on Bardstown Road in Louisville, Kentucky, when [Harris]
> approached her with a gun and forced her into her own van.  [Harris] drove the van
> out of the parking lot, keeping the gun on his lap and pointed toward Morris.  After
> driving to a wooded area in Indiana, [Harris] searched the van and Morris's purse.
> He then drove to a bank and attempted to use Morris's credit cards to obtain cash
> from an automatic teller machine.  This proved unsuccessful when Morris could not

recall her PIN (personal identification) numbers. [Harris] then drove to several retail stores, repeatedly telling Morris that if she did what he said, she would not get hurt. They first stopped at an H.H. Gregg store in Clarksville, Indiana, where [Harris] selected some items of computer equipment and Morris wrote a check to pay for it. [Harris] then drove to a nearby Office Max store and selected some more computer equipment. Morris again paid for the merchandise. The next stop was a Target store, where Morris paid for a television and other items selected by [Harris]. [Harris] then drove the van back to the Kentucky side of the Ohio River to another H.H. Gregg store, where more purchases were made. He then drove to a Kinko's Copiers outlet, where he made copies of all of the receipts, then to a White Castle restaurant where forty dollars worth of food was purchased with one of Morris's credit cards. Morris asserted that she made no attempt to escape at any of these stores because [Harris] kept the gun with him at all times. Finally, Appellant drove to the Kroger's store on Breckinridge [Street], where he attempted to use Morris's credit card to purchase over $800.00 worth of cigarettes. An employee suspected the credit card had been stolen and called the police. When the police arrived, Morris told them her story and [Harris] was placed under arrest. The entire series of events consume[d] approximately nine hours.

[Harris's] version was quite different. He claimed that he first encountered Morris in the Kroger's parking lot when she asked him to help her open her locked van because her arms were full of groceries. Twenty minutes later, Morris pulled up to a bus stop where [Harris] was waiting for his friend, Donnell Flippins, and offered him a ride. [Harris] accepted the offer, because he "figured she wanted more than just to do someone a favor." [Harris] testified that he and Flippins had been engaged in their normal Sunday routine of writing cold checks to retail stores in exchange for merchandise, then returning the merchandise later the same day for cash. [Harris] asked Morris to drive him to Flippins's residence. When they arrived, [Harris] sent Morris to get cigarettes while he explained to Flippins why he would be unable to participate in their usual Sunday scams. [Harris] testified that he told Flippins, "I met this young lady, Barbara, and we're going to spend some time together; she wants to spend some time with me." According to [Harris], Morris returned with the cigarettes and she and [Harris] proceeding to his apartment on Forty-first Street, so they could "spend some time together." However, because a co-tenant was "entertaining" at his apartment, [Harris] directed Morris to take him to his home on Greenwood Avenue, where he "shared with her" his criminal lifestyle and "she shared with me" her life experiences. According to [Harris], Morris became fascinated by his criminal activities and offered to participate by letting him use her credit cards to purchase merchandise which he could sell to a "fence" for fifty cents on the dollar. Thus, under [Harris's] version, Morris agreed to purchase merchandise for [Harris] at full retail price, then give the merchandise to [Harris] so that he could resell it at half price. [Harris] never explained how such conduct could constitute criminal activity. Regardless, in further of this bizarre agreement, [Harris] first obtained orders from his "fence" for specific items of merchandise, then proceeded

2

with Morris to the various retail stores where he selected and Morris purchased the items which had been ordered.  [Harris] claimed it was Morris's idea to take the gun "for protection purposes" and that she was a willing participant in all of the transactions.

*Id.*

### III.  Procedural History of Harris's *Batson* Claim

After the parties exercised their peremptory strikes, Harris made a *Batson* objection claiming that the prosecution's pattern of peremptory strikes established a *prima facie* showing of purposeful discrimination in violation of the Equal Protection Clause as applied in *Batson v. Kentucky*, 476 U.S. 79 (1986).  Harris's objection was based on the fact that the prosecutorial team had used four of its nine peremptory strikes on African-American jurors.

The trial court then held a *Batson* hearing.  Concluding that Harris had made a *prima facie* showing of discrimination, the trial judge questioned the prosecution on its reasons for striking the African-American jurors.  When questioned by the trial court, the chief prosecutor, Commonwealth Attorney John Dolan, proffered the following justifications for the strikes in question:

JUDGE:  Alright, Mr. Dolan. Okay, which ones are we talking –

DEFENSE COUNSEL:  160, 49, 138 and 47.

PROSECUTOR:  Okay, 160.  A number of reasons.  For the most part he was sleeping during most –

JUDGE:  Oh, is this number one [on the strike sheet]?

PROSECUTOR:  – of the voir dire. Yes.

JUDGE:  He was.  He was sound asleep.

PROSECUTOR:  The other reason, he has a friend who's now serving time for a drug conviction, as well. So, I think that gives us grounds to strike him.

3

Number 149 –

DEFENSE COUNSEL:  It was just 49.

PROSECUTOR:  I'm sorry. I'm sorry, right, 49, Ms. Buckner. She was the fourth person on the first row. She has a grandson who's now doing time for –

JUDGE:  In fact, that was the one you all asked me to strike for cause and then withdrew the motion.

DEFENSE COUNSEL:  No, it wasn't.

JUDGE:  Wasn't it?

DEFENSE COUNSEL:  That was a different one. That was –

PROSECUTOR:  But –

JUDGE: Oh, I thought that was –

DEFENSE COUNSEL:   47.

PROSECUTOR:  – for a number of reasons. First it seemed like she had a hard time following the questions that were being asked.  Her and her person next to her who was struck for cause, Ms. Barnes, seemed to be joking around quite a bit among themselves. And then Ms. Buckner when asked about any friends or relatives who had been charged or convicted of a crime, she had a grandson who was involved in a shooting, who is now, was convicted, had his own explanation of what occurred but was convicted and is doing time as far as she knows.

JUDGE:  She did appear to have some trouble understanding some things at some points in time.

PROSECUTOR:  And I'm not sure who the other one is.

DEFENSE COUNSEL:  138.

PROSECUTOR:  138, Ms. Fletcher.

JUDGE:  Fletcher.

PROSECUTOR:  Right, and the reason she was struck is because now she has cousins who were convicted of armed robbery. At least, I thought she said cousins.  It could have been one cousin.  But that person was convicted of armed

4

robbery and now doing time for that I do believe.

JUDGE:  Okay.

DEFENSE COUNSEL:  47.

JUDGE:  I don't remember that answer, but I'll assume that was on the tape.
I'll look.

PROSECUTOR:  And 47, Ms. Jones, she was the one, if the court
remembers, who is a paralegal at Seiller and Handmaker. One of the reasons for
striking her is that [she] was on a jury panel last week that was in Division Five, the
charge was robbery in the first degree, and that jury acquitted that defendant of
those charges.

DEFENSE COUNSEL:  Who was [inaudible] –

PROSECUTOR:  I believe someone from your office. Ed.

DEFENSE COUNSEL:  Oh, Ed.

PROSECUTOR:  And Amy Ellis from our office.  It was a robbery one charge and
the jury acquitted him.

JUDGE:  I think those are sufficient race-neutral explanations. Alright,
anything else you all want to put on the record about the jury selection
process?  I'll have the Sheriff get 'em back . . . .

(Tape 14:59:00-15:01:00).

After conducting the *Batson* hearing, finding race-neutral explanations for the juror

strikes, and denying Harris's objections to the prosecution's peremptory strikes, the trial

proceeded.  Harris was found guilty of kidnapping, three counts of robbery in the first degree,

and of being a persistent felony offender.  On May 18, 1998, the trial court sentenced Harris to

50 years for kidnapping (with persistent felony offender I enhancement) and 25 years for

Robbery I to run consecutively for a total of 75 years.

Harris filed a direct appeal with the Supreme Court of Kentucky challenging his

5

convictions.  While preparing the direct appeal, Harris's counsel discovered that the in-court videotape system used to record court proceedings had inadvertently reactivated during a recess when the prosecution team (two prosecutors and a detective) was privately discussing how it would exercise its final of nine peremptory challenges.  After viewing this portion of the tape, Harris's appellate counsel concluded that it was new evidence that the prosecution had used its strikes in a racially discriminatory manner in violation of *Batson*.

The relevant portion of the recorded conversation is as follows:

SCHULER:  We only need one more?

DOLAN:  Uh-huh.
 . . .

DOLAN:  There is really no rhyme or reason to this.
 . . .

DOLAN:        Okay, this is who we got guys so far.  We got 76, Plickta.  That's the guy who you originally liked, but been accused by his girlfriend.  We got the guy, 128, Michael Miller.  He's the guy with, the hippy, with the beard and the hair.  He was sitting behind Iredale, sitting behind the guy that you originally liked.  He was on the not guilty jury.  I got Mary Kerrick, who is 82.  She was the last person on the second row.  She was also a juror on the carrying concealed deadly weapon charge, which was a 10 to 2 to acquit.  We've got Tamara Jones, who is the girl at Seiller and Handmaker.  We've got Iredale [number 77], who you originally liked, but who was a juror on the Robbery I case.  Angela Fletcher, 138.  She's a black female who said her cousins were charged and convicted of armed robbery.  We've got Buckner, 49.  She's the old lady, the black lady.  The other one's already off.   And then Allen, who is 160.  He's the first guy here, who was sleeping.  We've got one more to go.

DOLAN:  Do you guys have any idea?

 . . .

AUBREY:  How about the lady that sat right here (gesturing)?  She's on her third criminal jury.

DOLAN:  Oh she's the older one

6

SCHULER:  Have you got anything down for [name deleted], number 151?

DOLAN:  He sat on a rape charge a long time ago.

SCHULER:  He's pretty old?

DOLAN:  There are a lot of old people on here.

SCHULER:   How about the guy in the first row, number 53? He was one of the ones who said he wanted to see some evidence?  Black shirt.  What does he do?

DOLAN:  Supervisor at (unintelligible) ... I'm going to do this old guy, 152, because he was also on that jury.

(Tape 14:46:04-14:50:33).

In November 1998, seven months after trial, Harris's counsel filed his brief asserting, among other claims of error, a *Batson* violation and citing the taped conference as new evidence in support of his claim.  In particular, Harris's counsel cited to the portion of the tape where Dolan describing juror 49 stated "she's the old lady, the black lady.  The other one's already off."   The Supreme Court of Kentucky affirmed Harris's conviction and sentence in an unpublished opinion rendered May 16, 2000.  With respect to Harris's *Batson* claim, the court held that the record supported the prosecutor's articulated race-neutral reasons for striking the subject jurors, including juror 49 and that "the remarks he made during the partial recording of the peremptory strike conference do not tend to prove otherwise."   (DN 15, App. at A-168). The court further held that the prosecutor's comments did not "tend to prove that any of the other three peremptory strikes in question were racially motivated."  *Id.*

Three of the seven Supreme Court of Kentucky justices dissented.  The dissenting justices would have remanded Harris's case to the trial court for further proceedings because "the trial court sits in a superior position, after considering this new evidence [*i.e.*, the

7

videotaped statements by the prosecutor] together with the prior evidence, to finally determine whether a *Batson* violation occurred." (DN 15, App. at A-177). For this reason, the dissent stated that "the trial court is the proper forum for this new evidence to be first considered" and that it "would remand this case to the trial court for it to conduct a hearing and determine whether the Commonwealth exercised peremptories for race-neutral reasons." *Id.*

After an unsuccessful collateral attack on his sentence in state court, Harris, acting *pro se,* filed a habeas action in this Court on November 25, 2003. Harris raised the *Batson* issue among others in his petition. In rejecting Harris's *Batson* claim, this Court determined that "the record here shows no error in the circuit court's application of the [*Batson*] three-step process." (DN 26 at 10). This Court explained that "[w]hile the parties may disagree in their interpretation of the taped lawyer conversation, the decision of the Supreme Court of Kentucky was not an unreasonable application of *Batson*." *Id.* at 10-11. By Order entered March 17, 2005, this Court dismissed Harris's petition. However, it granted Harris a certificate of appealability on his *Batson* claim stating that "while this Court concludes that no *Batson* violation occurred during jury selection at Petitioner's criminal trial, it nevertheless believes that Petitioner is entitled to further review of this claim only." (DN 27).

Harris filed a timely notice of appeal with the Sixth Circuit Court of Appeals.[1] The Sixth Circuit vacated this Court's dismissal of Harris's *Batson* claim and remanded the case for a renewed *Batson* hearing in light of the after-acquired videotape evidence. *Harris v. Haeberlin*, 526 F.3d 903, 905 (6th Cir. 2008). Specifically, the Sixth Circuit remanded the case so that this

---

[1]The Sixth Circuit appointed counsel to represent Harris on appeal. Appointed counsel continues to represent Harris on remand before this Court.

Court could "reassess prosecutorial credibility in light of the videotaped evidence." *Id.* at 914. The Sixth Circuit explained "that when after-acquired 'best evidence' bearing on prosecutorial demeanor surfaces, it is the trial court, not the appellate court, that should consider the evidence as part of the *Batson* fact-finding process." *Id.* "[T]he after-acquired evidence contained in the videotape is undoubtedly an example of such 'best evidence' because it captures the 'demeanor of . . . attorney [Dolan] who exercise[d] the challenge[s].'" *Id.* at 913 (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (alterations in Sixth Circuit opinion)).

In accordance with the Sixth Circuit's mandate, this Court held a renewed *Batson* hearing on December 18, 2008. (DN 61). The two lead prosecutors who tried Harris on behalf of the Commonwealth in 1998, David Schuler and John Dolan, testified at the hearing. Additionally, the Court received into evidence the DVD of the actual *voir dire* proceedings which includes the prosecution team's private conversation as well as its handwritten *voir dire* notes. At the conclusion of the hearing, the Court agreed to allow both parties to submit post-hearing briefs. Those briefs have now been filed, and this matter is ripe for decision.

### IV.  Analysis of Harris's *Batson* Claim

**A.      Passage of time**

Harris was tried over eleven years ago. Thus, the first issue that this Court must decide is whether it is possible to reconstruct a meaningful *Batson* hearing so many years after-the-fact. Harris argues that the hearing that this Court held demonstrates that due to the passage of time it is no longer possible for any court to conduct a meaningful *Batson* hearing. He asserts that this Court is left with no choice but to grant him the requested writ and allow the state to decide whether it wants to release or retry him.

9

"The determination of whether the passage of time has foreclosed a reasoned reconstruction is, in the first instance, a matter for the court that attempts the reconstruction, for that court will have before it not only the trial record, but also the parties whose recollections and explanations are to be explored." *Jordan v. Lefevre*, 293 F.3d 587, 593 (2d Cir. 2002). This case is somewhat unique as most of the cases dealing with the feasibility of a reconstruction hearing involve situations in which the trial court did not conduct a full *Batson* hearing. Such is not the situation here. The trial court did hold a full *Batson* hearing at which the prosecution articulated specific reasons for each of its strikes. The trial court then evaluated those reasons fully and stated its reasons on the record for concluding that no *Batson* violation occurred. It was only later that Harris discovered evidence of the private conference that he now claims casts doubt on the prosecution's explanations for the strikes.

Thus, this Court is not tasked with reconstructing an entire *Batson* hearing from scratch. Rather, on remand this Court's only task is to receive the newly discovered evidence about the prosecution's statements in the private conference and evaluate that evidence in light of its previously articulated reasons for striking the African-American jurors. To aid it in this task, the Court has the benefit of the video recording of the entire *voir dire* proceeding, including the private conference and the *Batson* hearing conducted by the trial court; the prosecution's contemporaneous notes; and the live testimony of both prosecutors. While their memories have faded to some degree, after viewing the video of proceedings as well as the handwritten notes, each prosecutor was able to offer meaningful testimony. The prosecutors also were able to offer testimony to the Court concerning their training, instruction, and practices on jury selection during the relevant time period.

10

Undoubtably, "there are cases where the passage of time may impair a trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected." *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir. 1992). This is not one of those cases. Through the hearing that this Court conducted in conjunction with the preexisting videotape and the prosecution team's notes from the actual *voir dire*, this Court was able to reconstruct a meaningful *Batson* hearing. Accordingly, the Court finds that despite the passage of time, it is able to render a decision on the merits of Harris's *Batson* claim.

**B.    The *Batson* framework**

The constitutional guarantee of equal protection ensures that a party may not exercise a peremptory challenge to remove an individual on account of that person's race. *See Batson,* 476 U.S. at 79. "*Batson* involves a tripartite burden-shifting inquiry." *Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009). In *Purkett v. Elem*, 514 U.S. 765 (1995), the Supreme Court set forth the required analysis under *Batson*:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Id.* at 767-68 (citations omitted).

The parties agree that the Sixth Circuit intended for this Court to begin with step two of the *Batson* analysis on remand. *Harris*, 526 F.3d at 914 ("[A] remand is proper to reassess prosecutorial credibility in light of the videotaped evidence."). At step two, "the burden shifts to the state to come forward with a neutral explanation for challenging [potential] jurors." *Batson*, 476 U.S. at 97. So long as the prosecution identifies a race-neutral reason for the strike, the

11

Court will then advance to step three.  *United States v. Copeland*, 321 F.3d 582, 599-600 (6th Cir. 2003) ("The government need only demonstrate a race-neutral justification for its exercise of a peremptory challenge of a juror; its reasons need not be persuasive nor plausible.").

"It is not until the third step that the persuasiveness of the justification becomes relevant -- the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  *Purkett*, 514 U.S. at 768.  "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility."  *Snyder v. Louisiana*, __ U.S.__, 170 L. Ed. 175, __, 128 S. Ct. 1203, 1208 (2008).  Thus, "in the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."  *Hernandez*, 500 U.S. at 365.  Because the evidence on this issue is often vague or ambiguous, "the best evidence often will be the demeanor of the attorney who exercises the challenge."  *Id.*  In addition to assessing the prosecutor's demeanor, the court must also assess whether the juror can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  *Snyder*, __ U.S. at __, 128 S. Ct. at 1208.  "[T]hese determinations of credibility and demeanor lie 'peculiarly within a trial judge's province . . . .'"  *Id.* (quoting *Hernandez*, 500 U.S. at 365)).

This Court embarks on its *Batson* analysis mindful that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett*, 514 U.S. at 768).

## C.     The selection of Harris's jury

The Court must now consider whether a *Batson* violation occurred in the selection of Harris's jury.  The prosecution used four of its peremptory strikes on African-Americans--juror

numbers 160, 49, 138, and 47.  Because "the Constitution forbids striking even a single

prospective juror for a discriminatory purpose," the Court will evaluate each of the four strikes.

*Snyder*, __ U.S. at __,128 S. Ct. at 1208 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900,

902 (9th Cir. 1994)).

### **Number 160**

The prosecution maintained at the original *Batson* hearing, and continues to maintain that

number 160 was stricken because he was sleeping during the *voir dire* and because he had a

friend that had been convicted of doing drugs.  The only portion of the videotaped conference

that pertains to number 160 is consistent with this explanation.  On the tape Dolan in reviewing

the strikes states as to number 160:  "And then Allen, who is 160.  He's the first guy here, who

was sleeping.  We've got one more to go."  The prosecution's original *voir dire* notes have the

notation "sleeping friend-drugs" for number 160.  The trial judge also remarked during the first

*Batson* hearing that he observed that number 160 was "sound asleep" during *voir dire*.  Sleeping

is a race-neutral explanation.  *See United States v. Castorena-Jaime*, 285 F.3d 916, 928 (10th

Cir. 2002) ("Juror inattentiveness during *voir dire* is a legitimate, race-neutral basis for a

peremptory strike under *Batson*.").  Thus, the prosecution met its burden under step two of the

*Batson* analysis by articulating race-neutral explanation for striking number 160.

The most troubling evidence concerning this juror is the notation "bm" in the

prosecution's notes.  At the hearing before this Court, Dolan explained that "bm" meant "black

male."  This is the only racially relevant piece of evidence that Harris has placed before the

Court concerning number 160.  However, the notation must be placed in the proper context.

Dolan had a notation beside virtually every member of the jury panel noting his/her race, sex,

13

approximate age, and sometimes physical appearance.  Based on the testimony at the hearing and the notes themselves, this Court can discern no racial animus behind the notations.  Rather, they reference a method of identification not discrimination.

The Court concludes that Harris has failed to demonstrate that the prosecution engaged in "purposeful racial discrimination" when striking number 160.  Rather, it clear to this Court that the prosecution struck number 160 because he slept through a large portion of the *voir dire*.  The new evidence contained in the recorded conference actually bolsters this conclusion.  In the conference, believing that they were speaking privately, the members of the prosecution team cited sleeping as the only reason for striking number 160.  Number 160's race was never mentioned in the conference.

### Number 49

At the original *Batson* hearing, the prosecution listed several reasons that it struck number 49:  1) her apparent difficulty following the proceedings; 2) her grandson's criminal conviction; and 3) the fact that she had been joking around a lot during *voir dire* with a juror seated next to her, number 155, who had been struck for cause.  Upon hearing these explanations, the trial judge remarked that "she did appear to have some trouble understanding some things at some points in time" and found that she was not removed in violation of *Batson*.

In the taped conference, the prosecution had the following to say about number 49: "We've got Buckner, 49.  ***She's the old lady, the black lady.  The other one's already off***." (emphasis added).  This statement was the primary reason that the Sixth Circuit remanded, and the meaning of this statement was the focal point of this Court's hearing.  The issue being whether "the other one" referred to another African-American thus showing intent to

14

discriminate or whether it referred to the panelist sitting beside number 49, and therefore was racially benign.

The prosecution's handwritten notes concerning number 49 state that she was a black female who had previously heard of the crime and that her grandson had been convicted of a shooting.  During *voir dire*, this juror explained that her grandson had been wrongly convicted of the shooting because he was actually not the triggerman.  The notes also indicate that number 49 was sitting beside number 155.

The Court concludes that the prosecution satisfied step two of the *Batson* inquiry by identifying race-neutral explanations for the strike.  The fact that number 49's grandson had been convicted of a serious crime that she believed that he did not actually commit, standing alone, would have supported the strike.  *See e.g.*, *Cook v. Lamarque*, No. CIV S-02-2240 LKK GGHP, 2007 U.S. Dist. LEXIS 81061 (E.D. Cal. Oct. 31, 2007) ("Any juror of any race whose close relative was wrongly convicted, or as the juror sincerely believed, might think that the criminal system was unfair.").

Here, the question is whether the prosecutor's private conversation on the tape is sufficient evidence to show that race was actually the real reason that this juror was stricken, not the reasons articulated by the prosecutor (her grandson, her confusion, and her joking with 155).  In order to answer this question, one must know the point of Dolan's reference to "the other one."  Dolan maintains that he was referring to number 155.  Number 155 was removed for cause earlier in the proceedings, but was allowed to return to her seat until the conclusion of *voir dire*.[2]  Thus,

_____

[2]The events that precipitated number 155's removal were quite bizarre.  When asked if she had heard of this event, number 155 stated that she had heard of it.  During the conference at the bench, she proceeded to explain to the judge and counsel that she had not only heard of the

she sat by number 49 for some time.  Number 155 and number 49 were observed by the

prosecution talking and joking with one another throughout the *voir dire.*  During the hearing

before this Court, Dolan explained:

> Q.      So in that context, if you would, look again at the comments in the Supreme
> Court opinion.  Can you explain for us kind of what you are saying in that first
> paragraph that begins with, "Okay, this is who we've got so far"?
>
> A.       Right. Would you like me to go down to --
>
> Q.      Down to the portion --
>
> A.      -- where it said, "We have got [name deleted] 49"
>
> Q.      Yes.
>
> A.      Okay. "She's the old lady, the black lady.  The other one is already off."
>
> Q.      From your recollection of reconstructing this, who were you referring to
> there?
>
> A.       I believe I'm referring to the lady that's seated next to 49, who is the lady
> that was just --we just indicated was struck for cause, who was 155, because when
> I reviewed the videotape, I recall her coming up and speaking with us and Judge
> Mershon, and she indicated that she had -- that she knew of the event, but not just
> knew or heard of the event, but that she actually believed she was a witness to this
> event. I do have a memory of this now because it was so unusual.  She indicated that
> -- she asked if any of the allegations included stops at a Wal-Mart where she
> frequented a lot because she believed that Mr. Harris and the victim, Miss Morris,
> were in the Wal-Mart, and she indicated that it looked like Miss Morris, the victim,
> was having -- essentially was not being restrained, was not being forced to do
> anything, was just hanging out with Mr. Harris.  She really believed that she saw Mr.
> Harris and the victim at that Wal-Mart.

---

event, but that she actually believed that she had witnessed it transpiring.  She was rather
adamant that the prosecution was mistaken that the event occurred at a Target store because she
rarely shopped at Target.  She was insistent that it took place at a Wal-Mart store.  She further
indicated that she both observed and spoke to the alleged victim at the Wal-Mart and that the
victim was not restrained by Harris and was acting on her own free will.

Q.      And do you remember telling the trial court that juror 49 seemed to be joking with this lady at some point?

A.      I do recall saying that to the Court. I don't have an independent memory of that now. But I do recall saying that, yes.

Q.      Was it your intent in picking this jury to intentionally exclude people based solely on their race?

A.      No, sir.

Q.      In fact, has that ever been your intention in doing a trial?

A.      No, sir.

(DN 61, pp. 57-59).

Based on its review of the original record, the newly discovered private conference, the prosecution's notes, and the testimony before this Court, the Court concludes that the only plausible explanation is that the "other one" referred to number 155, not to an African-American.[3] The comment was not racially tinged or motivated. This interpretation is consistent with the contemporaneous explanation that the prosecution gave to the trial court at the original *Batson* hearing where it noted that number 49 had been "joking around quite a bit" during *voir dire* with number 155 who was removed for cause.

Furthermore, in reviewing the tape of the actual *voir dire*, the Court did not find any evidence of discrimination in the questioning or treatment of African-American jurors. In fact, the Court observes that 3 of the 13 members of Harris's jury were African-American (jurors 86, 136, and 183). The prosecution actually wrote the notation "good juror" beside juror 183 on the handwritten notes. Additionally, on the tape immediately before the comment in question, in

--------

[3]The Court observes that none of the six jurors who were excused for cause were African-American females.

17

attempting to decide how to use their last strike one of the prosecutors can be heard saying that "there is no rhyme or reason to this."  If the prosecution's goal was to identify and eliminate African-American jurors then surely determining who to use the last strike on would not have been so difficult as a number of African-Americans remained on the panel at that point.

In sum, the Court finds a valid basis to strike juror 49 based on her grandson's prior conviction and  that the prosecution struck this juror for this reason[4] in addition to her confusion and the possibility that she had been tainted by sitting next number 155, whose conduct at the bench can only be described as bizarre.  Totally lacking, however, is any credible evidence that number 49 was removed because of her race.

**<u>Number 138</u>**

The prosecution maintained at the original *Batson* hearing, and continues to maintain that number 138 was removed because she stated that she had cousins that had been convicted of robbery.  The only portion of the videotape that pertains to number 138 is consistent with this explanation.  On the tape Mr. Dolan in reviewing their strikes states as to number 138:  "She's a black female who said her cousins were charged and convicted of armed robbery."  The prosecution's original *voir dire* notes have the notation "bf" and "cousins armed robbery" for number 138.

The crime Harris was charged with involved a robbery.  "[A] prosecutor may permissibly strike a prospective juror on the grounds that close relatives or friends have been convicted of the very crime at issue."  *United States v. Lampkins*, 47 F.3d 175, 178 (7th Cir. 1995).  Thus, the

---

[4]The Court notes that the prosecution did not leave any similarly situated white jurors on the panel.  There was not disparate treatment.

18

prosecution met its burden under step two of the *Batson* analysis by articulating a race-neutral explanation for striking number 138.

The only evidence that Harris can point to counter this race-neutral basis is the prosecution's reference to number 138 by her race in the dialogue on the tape and in their notes. If only African-Americans had been described in this manner this might be a compelling argument.   However, it is clear to this Court that the references were mere identifiers and not *indicia* of racially driven strikes.  The prosecution identified several non African-Americans in a similar fashion.  Several members of the jury were described as by their sex (male or female), age (young or old), race (black or white), and physical appearance (beard, hippy, black shirt, tie, etc.).

The Court concludes that Harris has failed to demonstrate that the prosecution engaged in "purposeful racial discrimination" when striking number 138.  Rather, it clear to this Court that the prosecution removed number 138 because her cousins had been convicted of the same crime that was at issue in the Harris case.

### Number 47

The prosecution maintained at the original *Batson* hearing that number 47 was removed because she was a paralegal at a law firm where one of the prosecutors previously worked and because she had served on a criminal jury the previous week that acquitted a defendant of robbery in the first degree.  In the private conference, Dolan's only reference to number 47 is identifying her by name and stating that she "is the girl at Seiller and Handmaker."

The reasons articulated by the prosecution at the original *Batson* hearing are legitimate race-neutral explanations for striking this juror.  *See United States v. Taylor*, 2009 U.S. App. LEXIS 9258 (4th Cir. Apr. 30, 2009) (noting that prior service on "a criminal jury that reached a

19

verdict of not guilty" was a race-neutral reason for striking the juror).  Additionally, the Court

observes that all similarly situated white jurors were also stricken--white jurors 152, 128,

and 77 who were on the same jury as number 47; and white jurors 76 and 82 who sat on a hung-

jury in a criminal case during the previous week.

The only evidence that Harris can point to counter this race-neutral basis is the

prosecution's designation of 47 as a black female in the handwritten notes.  Again, however, the

Court finds based on the totality of evidence that this designation was merely an identifier and not

a basis for a strike.  No credible evidence has been adduced by Harris that would undermine the

prosecution's race-neutral explanation for striking this juror.

## V.  Conclusion

As instructed by the Sixth Circuit Court of Appeals, on remand this Court conducted a

renewed *Batson* hearing.  Despite the passage of time, this Court concluded that it was possible to

reconstruct and hold a meaningful *Batson* hearing.  After reviewing the original *voir dire,* the trial

court's *Batson* hearing, the newly discovered videotape of the prosecutors' private conference,

and the prosecution's contemporaneous *voir dire* notes; and after listening to the prosecutors'

testimony before this Court, the Court finds that no *Batson* violation occurred.  The prosecutors'

race-neutral explanations for their strikes are amply supported by the record, and Harris has failed

to put forth any evidence that undercuts those explanations.  The Court is firmly convinced that

race did not motivate the strikes in question.

## VI.  Certificate of Appealability

In the event that Harris appeals this Court's decision, he is required to obtain a

certificate of appealability.  28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A district court

must issue or deny a certificate of appealability and can do so even though the petitioner has yet to make a request for such a certificate.  *Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002) ("Whether the district judge determines to issue a COA along with the denial of a writ of habeas corpus or upon the filing of a notice of appeal, the district judge is always required to comply with § 2253(c)(2) & (3) by 'indicat[ing] which specific issue or issues satisfy the showing required,' 28 U.S.C. § 2253(c)(3), *i.e*., a 'substantial showing of the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2).").

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2);  *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Where a court has decided a claim on the merits  "the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 483.  The Court has reexamined the merits of Harris's *Batson* claim in light of the *Slack* test to determine whether reasonable jurists could find its analysis debatable or wrong.  Based on the evidence adduced at the renewed *Batson* hearing, the Court is persuaded that reasonable jurists would not debate the correctness of its assessment of the claim.

Accordingly, the Court will enter a separate Order dismissing Harris's petition and

denying him a certificate of appealability.

Date:

cc:     Counsel of record
        Frederick Jesse Harris, Petitioner
4412.008